MEMORANDUM OF DECISION AND ORDER

LEVI, District Judge.
Subdivision 26661 of the California Food and Agricultural Code (the “California Act” or the “Act”) restricts the use by wholesalers of the term “fresh” on poultry product labels to poultry that has been stored at tempera­tures above 25 degrees.[1] The Act became effective on January 1, 1994.
Plaintiffs are three poultry and meat trade associations. Some of plaintiffs’ members process poultry for wholesale distribution in California from outside of the State. In an action filed December 2,1993, plaintiffs claim that the California Act is pre-empted by the Poultry Products Inspection Act (the “PPIA”), 21 U.S.C. §§ 451-470, a federal statute which also governs the labeling of poultry products, and further that the Act places an undue burden on, and discriminates against, interstate commerce.[2] After hearing *1463 on December 22, 1993, the court issued a preliminary injunction prohibiting defendant Henry J. Voss, Director of the California Department of Food and Agriculture, from enforcing the labeling provision of the Act when it became effective.
Plaintiffs presently move for summary judgment only on their pre-emption claim, and seek declaratory as well as permanent injunctive relief. Plaintiffs are supported in their motion by the United States Depart­ment of Agriculture (the “USDA”), which submitted an amicus curiae brief at the re­quest of the court. The motion is opposed by the Director of the California Department of Food and Agriculture and by intervenor, the California Poultry Industry Federation.[3]
For the reasons discussed below, plaintiffs’ motion for summary judgment on the pre­emption cause of action is granted. Because the pre-empted provision of § 26661 is not severable from the statute’s remaining provi­sions, the injunction barring enforcement of the labeling provision must also bar enforce­ment of the remainder of the statute.
I
Congress enacted the PPIA in 1957 “to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles ... to prevent the movement or sale in inter­state or foreign commerce of, or the burden­ing of such commerce by, poultry products which are adulterated or misbranded.” 21 U.S.C. § 452.
The PPIA contains an express pre-emption provision in a section entitled “Non-Federal jurisdiction of Federally regulated mat­ters-” 21 U.S.C. § 467e. Section 467e expressly preempts labeling requirements that are “in addition to, or different than” those made under the PPIA:
[mjarking, labeling,[4] packaging, or ingredi­ent requirements ... in addition to, or different than, those made under this chap­ter may not be imposed by any State ... with respect to articles prepared at any official establishment[5] in accordance with the requirements under this chapter....
Id. The question on this motion is whether the California Act establishes a “labeling re­quirement” that is “in addition to” or “differ­ent than” “those [labeling requirements] made under” the PPIA. If the answer is yes, then § 26661 is pre-empted by federal law.
A
Plaintiffs and the USDA argue that the California Act imposes a “labeling re­quirement” within the meaning of 21 U.S.C. § 467e because it limits the use of the word “fresh” on poultry product labels. Drawing a distinction between “requirements” and “prohibitions,” defendant argues that the California Act does not establish a “labeling requirement” because it does not require poultry producers affirmatively to include specified language on the label, but merely prohibits them from labeling poultry as “fresh” unless it complies with the Act.
Defendant’s interpretation of “labeling re­quirements” is hypertechnical and inconsis­tent with the language and purpose of the PPIA.[6] First, the term “requirements” ordi­narily includes prohibitory obligations.[7] One can be, and often is, required not to do *1464 something, and there is no practical differ­ence between a command that requires that the opposite of an action be taken—“you are required to be quiet”—as opposed to one that prohibits the very action—“talking is prohib­ited.” Either form of expression fairly is described as a requirement, requiring action or inaction. Here in mandatory language the California Act requires that the term “fresh” only may be placed on the label in certain circumstances.
Second, the language of several provisions of the PPIA indicates that Congress did not intend a distinction between “requirements” and “prohibitions.” For example, 21 U.S.C. § 459, entitled “Compliance by all establish­ments,” provides that “[n]o establishment ... shall process any poultry or poultry product except in compliance with the re­quirements of this chapter.” Similarly, § 467e gives the states concurrent jurisdic­tion with the USDA to prevent the distribu­tion of adulterated or misbranded articles “consistent with the requirements under this chapter.” Surely Congress did not intend to allow official establishments and states, in performing the tasks delegated to them un­der the PPIA, to heed only the affirmative, but not the prohibitory, portions of the stat­ute. Given this use of the term “require­ments” elsewhere in the PPIA (including an­other clause of § 467e), the word “require­ments,” as used in the pre-emption clause, should be construed to include prohibitory enactments. See Ardestani v. INS, — U.S. -, -, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991); Mississippi Poultry Ass’n, Inc. v. Madigan, 992 F.2d 1359, 1363 (5th Cir.), reh’g en banc granted, 9 F.3d 1116 (5th Cir.­1993).[8]
Third, a construction of the term “require­ments” to exclude prohibitory enactments would nullify the PPIA’s pre-emption clause. Under defendant’s interpretation, so long as a state used prohibitory phrasing, state label­ing regulations would not be pre-empted even if in direct conflict with affirmative fed­eral requirements under the PPIA.[9] A nar­row interpretation of “requirements,” to ex­clude prohibitions, entirely defeats the pre­emption clause and would leave labeling reg­ulation within the power of the states. Yet according to the legislative history of the pre-emption clause, one of its key purposes was to ensure national uniformity in labeling:
States would be precluded from impos­ing additional or different labeling ... re­quirements for federally inspected prod­ucts.
Both industry and consumers would ben­efit from ... greater uniformity of labeling requirements....
H.R.Rep. No. 1333, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 3426, 3442.
Finally, there is little force to defendant’s argument that in other legislative schemes *1465 Congress expressly has pre-empted both re­quirements and prohibitions and thus by neg­ative inference only intended here to pre­empt requirements. Defendant particularly relies on the pre-emption provision in the Public Health Cigarette Smoking Act, 15 U.S.C. § 1331-1340 (the “Smoking Act”), which pre-empts any “requirement or prohi­bition” inconsistent with the Smoking Act. Id. § 1334(b). But this same argument has been convincingly rejected in the context of the Federal Insecticide, Fungicide and Ro-­denticide Act (“FIFRA”), which has a pre­emption clause similar to that in the PPIA. See Shaw v. Dow Brands, Inc., 994 F.2d 364, 371 (7th Cir.1993) (“ ‘[n]o requirements or prohibitions’ is just another way of saying a ‘[sjtate shall not impose ... any require­ments.’ Not even the most dedicated hair­splitter could distinguish these statements.”); Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177, 1179 (10th Cir.) (“Although the words employed in § 136v(b) of FIFRA are different from those in ... the ... Smoking Act, their effect is the same.”), cert. denied, — U.S. -, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993); see also Stamps v. Collagen Corp., 984 F.2d 1416, 1421 (5th Cir.) (as to the Medical Device Amendments of the Federal Food, Drug, and Cosmetic Act (the “MDA”): “It would be anomalous to interpret the MDA differently from the [Smoking Act] solely on the basis that while they both employ ‘requirement,’ the MDA omits ‘prohibition.’ ”), cert. denied, — U.S. -, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993). Congress uses a variety of similar formulations when enacting broad pre-emption clauses, and there is no indica­tion in the PPIA, or in the other statutes with similar pre-emption clauses, that Con­gress intends substantive differences to flow from minor wording changes in these various clauses. See 21 U.S.C. § 678 (Federal Meat and Inspection Act) (“addition[al]” or “differ­ent” state “requirements”); 7 U.S.C. § 136v(b) (FIFRA) (same); 21 U.S.C. § 360k(a) (the MDA) (same); 42 U.S.C. § 4846 (Lead-Based Paint Poisoning Preven­tion Act of 1973) (pre-empting state laws which “provide for a requirement, prohibition or standard which differs from” federal law); 15 U.S.C. § 1392(d) (National Traffic and Motor Vehicle Safety Act of 1966) (pre-empt-­ing state provisions “not identical to the Fed­eral standard”).
For all of these reasons, the court con­cludes that the term “requirements” in the PPIA pre-emption clause unambiguously in­cludes prohibitory enactments. It follows that the California Act imposes a “labeling requirement” within the meaning of § 467e.
B
If the California Act imposes a “labeling requirement” within the meaning of § 467e, it is at least “in addition to ... those [label­ing requirements] made under the PPIA.” 21 U.S.C. § 467e. No party disputes the fact that plaintiffs’ members can label poultry products that have been chilled between 1 and 25 degrees Fahrenheit as “fresh” and comply with all federal labeling requirements but not comply with the California Act. Nevertheless, defendant contends that “in addition to” has a meaning in this context other than its normal meaning and thus that the California Act is not pre-empted by the “in addition to” language of the PPIA.
Defendant first argues that “in addition to” should be distinguished from “identical to,” which is the language used in the pre-emp­tion clause in the National Traffic and Motor Vehicle Safety Act of 1966. This argument is similar to defendant’s attempt unreasonably to limit the meaning of “requirements” and fares no better. “Not identical” and “in ad­dition to, or different than” are not distin­guishable under any fair construction of the phrases.[10] Defeated by the plain language of *1466 the statute, defendant suggests that the USDA’s failure to attack state labeling provi­sions that were enacted both before and after passage of § 467e amounts to an agency interpretation of the statute—presumably that “in addition to” means less than “not identical to”—to which deference is appropri­ate. But the USDA has challenged several state labeling laws on pre-emption grounds, both as a party and as an amicus curiae,[11] and it is hardly surprising that the USDA has not challenged or indeed may not have been aware of every state law that may be pre-empted by the PPIA. Little can be in­ferred from the exercise of such discretion or from lack of knowledge, certainly not an agency interpretation of “in addition to” dif­ferent from its plain meaning and different from the position taken by the agency in this litigation.
Finally, defendant argues that “in addition to” must have a meaning other than its plain and normal meaning because the PPIA gives the states concurrent jurisdiction with the USDA in preventing the distribution of adul­terated or misbranded poultry. But § 467e provides that the states may exercise concur­rent jurisdiction with the USDA over poultry products inspected under the PPIA “consis­tent with the requirements” made under the PPIA. The provision authorizes states to undertake, concurrently with the USDA, ef­forts to enforce federal requirements. It does not grant states the authority to enact their own additional requirements. See Armour & Co. v. Ball, 468 F.2d 76, 84 (6th Cir.1972) (construing the identical language in the Federal Meat Inspection Act as per­mitting Michigan to enforce only federal, not state, misbranding provisions), cert. denied, 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973); Swift & Co. v. Walkley, 369 F.Supp. 1198, 1199-1201 (S.D.N.Y.1973) (same). Where Congress in the PPIA intended that the states could develop standards stricter than the federal standards it made explicit provision. See, e.g., 21 U.S.C. § 454(a)(1) (authorizing the USDA to cooperate with appropriate state agencies in developing and administering inspection requirements “at least equal to” the requirements contained in the PPIA). The pre-emption clause as to labeling requirements evinces no such intent and uses no such language.
In short, the California Act imposes a la­beling requirement that is at least “in addi­tion to” labeling requirements made under the PPIA There is no sound basis for inter­preting the language of the pre-emption clause in a manner other than that dictated by its plain language. Plaintiffs therefore are entitled to summary judgment on their pre-emption claim.
C
Alternatively, the California Act’s labeling requirement is pre-empted by § 467e be­cause it is “different than” existing federal poultry labeling requirements.
Federal regulations do not define “fresh” with respect to poultry but do define the term “frozen.” See 9 C.F.R. § 381.66f(2) (poultry to be frozen “shall be frozen ... so as to bring the internal temperature of the birds at the center of the package to 0 [de­grees] F. or below within 72 hours from the time of entering the freezer”). The USDA also has promulgated a regulation that allows poultry to be “labeled ‘frozen’ only if it is frozen in accordance with § 381.66f(2) under Department supervision and is in fact in a frozen state.” Id. § 381.129(b)(3). Federal regulations also dictate that “[a]ll poultry that is slaughtered and eviscerated in [an] official establishment shall be chilled immedi­ately after processing so that the internal temperature is reduced to 40 [degrees Fahr­enheit] or less.” Id. § 381.66(b)(1).
In July of 1988, the USDA issued a policy memo stating that it would permit the term “fresh” to be used only on labels of poultry products that had not been chilled to a temp­ *1467 erature of 26 degrees or less. See USDA Policy Memo 022B (July 11, 1988). Shortly thereafter, however, the agency reversed its position by issuing Policy Memo 022C. Un­der the new policy, the USDA interprets its regulations to permit poultry processors to label poultry as “fresh” if it is stored at 40 degrees or less and has not been “frozen,” at or below zero degrees:
Policy Memo 022B is being revised to re­flect the deletion of the provision that es­tablished 26 degrees Fahrenheit (or less) as the threshold temperature at which un­processed poultry products could not be labeled as “fresh.” The Agency has now decided, after much deliberation on this issue, not to limit the use of the term “fresh” on unprocessed poultry products based on an internal temperature with the exception as defined by the current regula­tions, i.e., product is above zero degrees and below 40 degrees Fahrenheit, and has not been previously frozen at or below zero degrees Fahrenheit. This decision is pred­icated on the belief that it is not practical under existing marketing strategies and distribution patterns, to define “fresh” in terms of internal temperature beyond the scope of the current regulations, nor is it practical to define consumer expectations for poultry products labeled as “fresh.”
USDA Policy Memo 022C, at 2 (Jan. 11, 1989).
“[A]n agency’s interpretation of its own regulations ... must be given ‘controlling weight unless it is plainly erroneous or incon­sistent with the regulation.’” Stinson v. United States, — U.S. -, -, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Although the regulations do not di­rectly address the definition of “fresh,” they do define “frozen” and limit the use of the word “frozen” on the label. The agency’s view, reflected in Policy Memo 022C, that what may not be labeled as “frozen” may be labeled as “fresh” is not an unreasonable construction of the regulatory scheme.[12] Policy Memo 022C therefore should be given controlling weight.[13]
Under Policy Memo 022C’s interpretation of 9 C.F.R. §§ 381.66(b)(1) & 381.129(b)(3), federal regulations permit poultry to be la­beled “fresh” if it has been stored at temper­atures above 0 degrees and at or below 40 degrees Fahrenheit. Thus, some poultry which may be labeled as “fresh” under feder­al requirements may not be labeled “fresh” under the California Act’s 25 degree rule. It follows that the California Act’s labeling re­quirement is “different than” labeling re­quirements made under the PPIA.[14] Plain­tiffs therefore are entitled to summary judg­ment on their pre-emption claim on this al­ternative ground.[15]
*1468 II
The California Act addresses more than just labeling; it also makes it illegal to “ad­vertise, ... describe, otherwise hold out, or sell as ‘fresh’ ” poultry which does not satisfy the Act’s 25 degree rule. It becomes neces­sary to determine whether the pre-empted labeling provision is severable from the re­mainder of the Act.
Subdivision 26661 does not contain its own severability provision, but the Food and Agriculture Code includes a general sever-­ability provision that applies to the entire code.[16] Under California law, the presence of a severability clause “normally calls for sustaining the valid part of [an] enactment.” Calfarm Ins. Co. v. Deukmejian, 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 170, 771 P.2d 1247, 1255 (1989).[17] But the presence of such a general clause is not conclusive as to the severability of any particular provision. Id.; see also Gerken v. Fair Political Practices Comm’n, 6 Cal.4th 707, 714, 25 Cal.Rptr.2d 449, 453, 863 P.2d 694, 698 (1993); In re Blaney, 30 Cal.2d 643, 655, 184 P.2d 892, 900 (1947). The final determination of severabili­ty
depends on whether the remainder ... is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute or constitutes a completely op­erative expression of the legislative intent ... [and is not] so connected with the rest of the statute as to be inseparable.
Santa Barbara Sch. Dist. v. Superior Court, 13 Cal.3d 315, 331, 118 Cal.Rptr. 637, 650, 530 P.2d 605, 618 (1975) (interior quotation marks and citations omitted).
The difficult obstacle to severability here is that the Act addresses the overall marketing of poultry as “fresh.” Because of the pre-emptive effect of the PPIA, one criti­cal portion of the marketing process—the label—cannot be regulated. One has only to imagine the marketing process for poultry, properly labeled as “fresh” under federal standards, but which may not be “sold,” “de­scribed,” “advertised,” or “held out” as such under California law to appreciate the confu­sion, by consumers and wholesalers alike, that would ensue were the Act to stand with­out the labeling provision. For example, un­der such a scheme a wholesaler might not be able to sell poultry properly labeled as “fresh” under federal standards or indicate in any way that the poultry is “fresh” even though it is properly so labeled. This confu­sion will arise precisely because the Act’s labeling provision is “so connected with the rest of the statute as to be inseparable.” Id.; see also People’s Advocate, Inc. v. Superior Court, 181 Cal.App.3d 316, 332, 226 Cal.Rptr. 640, 649 (1986) (provision not severable when “inextricably connected ... by policy consid­erations”). Moreover, in these circumstances there can be no confidence that the legisla­ture would have adopted a measure that would make illegal the “selling” or “describ­ing” of poultry as fresh when the very same poultry properly would be labeled as “fresh.” See id. at 333, 226 Cal.Rptr. at 650. Finally, were the legislation to stand, the terms “ad­vertise ... describe, otherwise hold out, or sell” would require re-defining to exclude their application to the label. This sort of re­drafting is inconsistent with severability. Id. at 330 n. 15, 226 Cal.Rptr. at 648 n. 15.[18]
*1469 In short, when the “fresh” label is placed beyond regulation, in a context in which the label will be inconsistent with remaining State regulation, the substantive reach of the Act is so altered and impaired that the label­ing provision may not be deemed severable. See Spokane Arcades, Inc. v. Brockett, 631 F.2d 135, 139 (9th Cir.1980) (severability “would create a program quite different from the one ... actually adopted”), cert. denied, 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981).[19]
Ill
The California Act’s 25 degree rule estab­lishes a “labeling requirement” that is “in addition to, or different than” labeling re­quirements made under the PPIA. Accord­ingly, the court makes the following orders:
(1) Plaintiffs’ motion for summary judg­ment on Count One of the complaint is GRANTED;
(2) Plaintiffs’ motion for declaratory and injunctive relief is GRANTED;
(3) IT IS HEREBY DECLARED that the labeling requirement in Subdivision 26661 of the California Food and Agricultural Code is pre-empted by federal law; and,
(4) Because the labeling provision in Sub­division 26661 is not severable from the sub­division’s nonpre-empted provisions, defen­dant Voss is permanently enjoined from en­forcing Subdivision 26661 of the California Food and Agricultural Code until further order of court.
IT IS SO ORDERED.

. No person who processes, butchers, slaughters, packs, repacks, or sells poultry or poultry meat for wholesale distribution or sale, or who engages in the business of buying, selling, or reselling poultry or poultry meat on commission for wholesale distribution or sale shall advertise, label, describe, otherwise hold out, or sell as "fresh” any poultry or poultry meat whose internal temperature ever has been equal to or below 25 degrees Fahrenheit or that ever has been stored in the aggregate for 24 hours or more at an average ambient temperature of 25 degrees Fahrenheit or be­low.
Cal.Food & Agric.Code § 26661.

. As to the interstate commerce portion of the complaint, which is not at issue on this motion, plaintiffs argue that the purpose of the California Act is to harm out-of-State poultry distributors. According to plaintiffs, because of temperature variations within refrigerated trucks, some of the poultry transported at a distance will necessarily reach temperatures below 25 degrees if none of the poultry is to exceed 28 degrees, the optimal temperature at which to store poultry. See Decl. of William Lovette. Further, plaintiffs note that the Act specifically exempts retailers from its terms. Thus, retailers may label as "fresh” poul­try that has been maintained by them at tempera­tures far below 25 degrees. Plaintiffs argue that the exception for retailers reveals that the true *1463 purpose of the enactment is to favor local whole­salers rather than provide more accurate infor­mation to consumers.

. Defendant and intervenor will be referred to collectively as “defendant.”

. "Labeling" is defined in the PPIA as "all la­bels” and other written, printed, or graphic mat­ter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article. Id. § 453(s). "Label" in turn is defined as "a dis­play of written, printed, or graphic matter upon any article or the immediate container (not in­cluding packaged liners) of any article.” Id.

. All major poultry companies process their products at "official establishment[s],” within the meaning of § 467e. See Declaration of George B. Watts in Support of Motion for Preliminary Injunction ¶ 3.

. Defendant correctly notes that express preemp­tion provisions are to be interpreted narrowly. Cipollone v. Liggett Group, Inc., - U.S. -, -, 112 S.Ct. 2608, 2621, 120 L.Ed.2d 407 (1992). However, a narrow interpretation is not the same as one that is unreasonably cramped.

. The word "requirement” is defined as: "1. Something that is required; necessity. 2. Some­thing obligatory; prerequisite.” American Heri­tage Dictionary 1050 (2d Coll.Ed.1985).

. Defendant notes that Congress enumerated sev­eral "[l]abeling ... requirements” in 21 U.S.C. § 457 and several "[plrohibited acts” in 21 U.S.C. § 458, and from this argues that the Act distinguishes between "requirements” and "pro­hibitions,” and that the pre-emption clause should be understood in light of this distinction. This argument is flawed for several reasons. First, as noted above, it is inconsistent with the use of the term “requirements” in § 459 and elsewhere in § 467e. Second, the Act does not refer to all prohibitory measures in the PPIA as "prohibitions,” suggesting that Congress did not intend a separate category of delimited prohibi­tions. See, e.g., id. § 460(d) (prohibitory subsec­tion entitled “[regulation of transactions ...”) (emphasis added). Finally, the USDA has re­ferred to its prohibitory regulations as "require­ments," suggesting that the agency charged with enforcement of the PPIA does not understand the PPIA to distinguish prohibitions from require­ments. See 37 Fed.Reg. 9706, 9707 (1972) ("The requirements of Subpart N of the regulations [9 C.F.R. §§ 381.115-141] are deemed necessary to assure compliance with [§ 453(h)(6) ] and other provisions of the [PPIA].") (emphasis added). At least two of the regulations contained in Subpart N are phrased as "prohibitions.” See 9 C.F.R. § 381.129(b); id. § 381.129(b)(5).

. For example, a regulation made under the PPIA requires that poultry products including two or more ingredients "shall show a statement of the ingredients.” 9 C.F.R. § 381.118(a). Un­der defendant's theory, a state could enact a law prohibiting a statement of ingredients on poultry products sold in that state and such a law would not be preempted by § 467e because it would be a "prohibition,” not a "requirement.” More­over, this law would not be pre-empted by virtue of its direct conflict with the PPIA because this form of pre-emption analysis is superseded by the express pre-emption provision. Cipollone, - U.S. at -, 112 S.Ct. at 2618 (“Congress’ enactment of a provision defining the pre-emp-­tive reach of a statute implies that matters be­yond that reach are not preempted.”).

. Defendant also claims that other provisions of the PPIA indicate that Congress used terminolo­gy other than "in addition to, or different than" when it meant to bar anything but "identical” standards. Defendant relies on a PPIA provision which prohibits the importation of poultry or poultry products from foreign countries unless they "(A) [have been] subjected] to the same inspection ... standards applied to products pro­duced in the United States; and (B) have been processed in facilities and under conditions that are the same as those under which similar prod­ucts are processed in the United States." 21 U.S.C. § 466(d)(1) (emphasis added). However, this provision cannot shed any light on congres­sional intent at the time § 467e was enacted, because § 466(d)(1) was enacted as part of the 1985 amendments to the PPIA, 17 years after passage of § 467e. In any event, the argument offered here is but a variation on defendant's *1466 stubborn refusal to acknowledge that some words and phrases have the same meaning.

. See Grocery Mfrs. of America, Inc. v. Gerace, 581 F.Supp. 658, 660 n. 1 (S.D.N.Y.1984) (USDA is defendant to Commissioner Gerace’s counterclaim), aff'd in part and rev’d in part, 755 F.2d 993 (2d Cir.), judgment aff'd and cert. denied, 474 U.S. 801, 820, 106 S.Ct. 36, 69, 88 L.Ed.2d 29, 56 (1985); American Meat Institute v. Ball, 550 F.Supp. 285, 288 (W.D.Mich.1982) (USDA sub­mits amicus curiae brief), aff'd sub nom. Ameri­can Meat Institute v. Pridgeon, 724 F.2d 45 (6th Cir.1984); Instituto Puertoriqueno de Carnes, Inc. v. Davila, Civ. No. 92-2098 (HL) (D.P.R.1992) (same).

. There is no one obvious temperature below which it can be said that poultry is no longer "fresh.” Zero degrees Fahrenheit is the approxi­mate temperature at which all water molecules in poultry are frozen; at 25 degrees a sufficient number of water molecules are frozen to make the poultry hard to the touch; at 14 degrees bacterial growth stops.

. In addition to deferring to the USDA’s inter­pretation of its regulations, as expressed in Poli­cy Memo 022C, some deference may be granted to the USDA’s amicus curiae brief. Although little weight should be given to the expedient litigating positions of government agencies, see, e.g., Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988); see also 3550 Stevens Creek Assoc. v. Barclays Bank of California, 915 F.2d 1355, 1364 n. 19 (9th Cir.1990), cert. denied, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991), the USDA’s brief in this case only reaffirms its five-­year old interpretation of the relevant regula­tions.

. The “made under” language in § 467e means that the PPIA’s pre-emptive effect is not limited to provisions actually contained in the statute, but also includes regulations promulgated by the USDA. See Jones v. Rath Packing Co., 430 U.S. 519, 529-32, 97 S.Ct. 1305, 1311-13, 51 L.Ed.2d 604 (1977) (invalidating California net weighing requirements which did not allow for reasonable variations of weight caused by moisture loss be­cause such requirements were different than USDA regulations that took moisture loss into account).

. Contrary to defendant’s assertions, no factual issues need to be resolved in order to reach this conclusion. It is irrelevant that Policy Memo 022C may have been adopted only as a result of pressure brought to bear on the USDA by groups such as plaintiff National Broiler Council. See Home Box Office, Inc. v. FCC, 567 F.2d 9, 57 (D.C.Cir.) (noting that "informal contacts be­tween agencies and the public are the 'bread and butter’ of the process of administration"), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Also irrelevant is the fact that the *1468 USDA's position on the labeling of "fresh” poul­try has evolved over time, see Rust v. Sullivan, 500 U.S. 173, 186-88, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991) (holding that an agency must be given ample latitude to reconsider its poli­cies), and the fact that a former high-ranking official of the Food- Safety Inspection Service prefers the rescinded Policy Memo 022B to the currently operative Policy Memo 022C. See Decl. of Dr. Lester Crawford ¶ 20.
Defendant's reference to several other USDA "policies” in an attempt to generate a factual dispute is similarly unavailing. These "policies,” which concern the shipping, grading, and weigh­ing of poultry, either conform to Policy Memo 022C or are not relevant to poultry labeling.

. "If any provision of this code or its applica­tion to any person or circumstance is held inval­id, the remainder of the code or the application of the provision to any other person or circum­stance is not affected.” Cal.Food & Agric.Code § 17.

. It is unnecessary to resolve whether severabil­ity is governed by federal or state law because the standards are "essentially the same.” Asso­ciation of Nat’l Advertisers, Inc. v. Lungren, 809 F.Supp. 747, 762 n. 18 (N.D.Cal.1992).

. The need for such significant rewriting distin­guishes this case from Legislature v. Eu, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991), cert. denied, — U.S. -, 112 S.Ct. 1292, 117 L.Ed.2d 516 (1992).

. Cf. Metromedia, Inc. v. City of San Diego, 32 Cal.3d 180, 191, 185 Cal.Rptr. 260, 267, 649 P.2d 902, 909 (1982) (City’s ban on off-site adver­tising signs could not be saved by severance or a limiting construction confining its prohibition to commercial signs; severance would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals, and one which would invite constitutional diffi­culties in distinguishing between commercial and noncommercial signs”). A law which pro­hibits the advertising of poultry as "fresh” de­spite the fact that such poultry is "fresh” under federal law may also present constitutional diffi­culties. See Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) (estab­lishing test for determining validity of restric­tions on commercial speech). This possibility also weighs against severability. See United States v. Horton, 685 F.Supp. 1479, 1485 (D.Minn.1988), aff'd, 902 F.2d 1575 (8th Cir.­1990) (table).